# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 22-3528

ALEXANDRA M. JACKSON, APPELLANT,

V.

DENIS MCDONOUGH,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued March 7, 2024                                    Decided June 25, 2024)

*Zachary M. Stolz*, with whom *Jenna E. Zellmer* was on the brief, both of Providence, Rhode Island, for the appellant.

*Nathan P. Kirschner*, with whom *Richard J. Hipolit*, Deputy General Counsel for Veterans Programs; *Mary Ann Flynn*, Chief Counsel; and *Dustin P. Elias*, Deputy Chief Counsel, all of Washington, D.C., were on the brief for the appellee.

Before ALLEN, LAURER, and JAQUITH, *Judges*.

LAURER, Judge, filed the opinion of the Court. JAQUITH, Judge, filed a dissenting opinion.

LAURER, *Judge*: Appellant, Alexandra M. Jackson, is an attorney who represented United States Army and Navy veteran John A. Lovier before the Department of Veterans Affairs (VA) agency of original jurisdiction (AOJ).[1] Ms. Jackson, through counsel, challenges a May 22, 2022, Board of Veterans' Appeals (Board) decision denying her attorney fees paid from past-due benefits awarded to Mr. Lovier. VA granted Mr. Lovier an increased rating for his left hip disability in a December 2021 rating decision that addressed his September 2021 filing with VA.[2]

From afar, the case seems simple. The Court must decide which of two rating decisions is the "initial decision . . . with respect to the case."[3] Is the initial decision the original grant of service connection in March 2008 or the more recent December 2021 decision granting an increase in benefits? How the Court categorizes the September 2021 submission controls. And that boils down

---

[1] Record (R.) at 3-6.

[2] R. at 88-91, 396-401.

[3] 38 U.S.C. § 5904(c)(1).

to whether the September 2021 submission is a supplemental claim. If the September 2021 submission is a supplemental claim, then the March 2008 decision is the initial decision with respect to the case, and appellant likely prevails and can recover attorney fees under § 5904(c)(1).

Congress overhauled the veterans benefits claims and appeal system when it passed the Veterans Appeals Improvement and Modernization Act of 2017 (AMA).[4] Part of the overhaul included amendments to the law permitting fees for services performed by an agent or attorney before VA. Before the AMA, representatives could obtain fees for work performed after a Notice of Disagreement (NOD) was filed.[5] Now, under the AMA, representatives can earn fees for work performed after the AOJ makes an "initial decision . . . with respect to the case . . . ."[6] Congress didn't define the term "initial decision," and the term "with respect to the case" predates the AMA. So the Court will analyze Congress's overhaul and determine whether the AMA changes what's already settled.

The appeal focuses on how to interpret 38 U.S.C. § 5904(c). But to meaningfully decide the ultimate interpretive question, the Court must first answer an essential preliminary legal question. That question is: Did a new procedural review option under the AMA—the supplemental claim—displace the longstanding understanding of increased rating claims? Put another way: Under the AMA, is an increased rating claim a supplemental claim? Once we answer this question, we have ample legal guidance to answer whether the Board erred.

The parties each use the well-recognized steps from *Chevron v. Natural Resources Defense Council, Inc.,* to support their arguments.[7] They choose different paths on their way and arrive at different places. Appellant's thesis is straightforward: she argues that, under the plain language of the AMA, her client's September 2021 submission is a supplemental claim.[8] And since it's a supplemental claim, she's entitled to a fee because her advocacy led to the grant of additional

---

[4] Pub. L. No. 115-55, 131 Stat. 1105 (codified as amended in scattered sections of 38 U.S.C.).

[5] 38 U.S.C. § 5904(c)(1) (Supp. V 2006).

[6] 38 U.S.C. § 5904(c)(1) (2018).

[7] *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

[8] Appellant's Brief (Br.) at 9 ("When examined within the plain language, structure, and statutory history, it is clear and unambiguous that Congress defined increased rating claims as supplemental claims—not initial or original claims—thus, there is no gap for VA to fill.").

benefits for her client.[9] The Secretary argues that an increased rating claim is distinct from a supplemental claim—a point VA explained through its rulemaking.[10] He says that *Chevron* authorized VA to fill a legal gap and that his regulation—38 C.F.R. § 3.1—answers the legal question, and the Board's denial of past due fees was proper.[11] We need not explore the *Chevron* paths the parties walk; we see no ambiguity in the statute. As explained below, the Court affirms the Board's decision because the plain statutory text shows that the September 2021 submission wasn't a supplemental claim—it was a new claim.[12] Moreover, this reading of the statute is supported by the relevant caselaw and a holistic reading of the AMA.

## I. PROCEDURAL HISTORY

The Court reviews the procedural history first, which began when Mr. Lovier filed for service connection in April 2007 for a hip disability.[13] In March 2008, VA granted him service connection for status post surgery avascular necrosis of femoral heads (bilateral hip disability), with a 0% rating.[14] Appellant's law firm began representing Mr. Lovier and filed an NOD in March 2009, challenging the noncompensable rating.[15] In November 2009, VA increased Mr. Lovier's rating to 10% for both his left and right hip, effective April 2007.[16] Mr. Lovier continued to pursue a higher rating, and the Board remanded his claim in September 2013 and again in November 2017.[17] Then in January 2018, appellant took over representing Mr. Lovier.[18] The Board ultimately

---

[9] Appellant's Br. at 4.

[10] Secretary's Br. at 14-15 ("Moreover, an increased rating claim is by definition *not* a disagreement with a prior rating decision, and therefore, as VA explained in the Final Rule, does not seek a 'readjudication' of the rating previously assigned. 38 U.S.C. § 5108(a) (a supplemental claim requires VA to 'readjudicate' the claim) . . . .").

[11] Secretary's Br. at 15-17.

[12] While Congress provided a definition for "supplemental claim," *see* 38 U.S.C. 101(36), it did not define, or even name, a non-supplemental claim. In this opinion, we will use the term "new claim" to identify a claim that does not meet the definition that Congress provided of a supplemental claim.

[13] R. at 1936-53.

[14] R. at 1524-28.

[15] R. at 1516. The same law firm represented the veteran throughout this period, although the individual attorneys changed. *See, e.g.*, R. at 765, 1493, 1517.

[16] R. at 1471.

[17] R. at 1300.

[18] R. at 756-57.

denied Mr. Lovier's claim for a higher initial rating in December 2018.[19] He didn't appeal, and the December 2018 decision became final.

Now jump forward a couple of years to where the legal questions at issue start to take shape. In February 2021, Mr. Lovier had hip surgery.[20] In September 2021, appellant assisted Mr. Lovier in filing his Application For Disability Compensation and Related Compensation Benefits (VA Form 21-526EZ).[21]

VA then scheduled Mr. Lovier for a VA compensation and pension (C&P) exam, which he attended in October 2021.[22] Upon reviewing the evidence, VA determined that Mr. Lovier "filed a claim for increased evaluation that was received on September 20, 2021."[23] In December 2021, VA granted a 100% rating for his left hip, effective from February to August 2021, based on his left hip replacement, and 30% afterward, leading to the award of $16,264.53 of past-due benefits to Mr. Lovier.[24] VA notified appellant that it wasn't going to pay her any direct fees from Mr. Lovier's award because "VA never received a qualifying request to review [the December 2021 rating] decision."[25] Appellant filed an NOD with that decision, and the Board's May 2022 decision followed.[26]

## II. LEGAL LANDSCAPE

### A. Services of Agents and Attorneys Under 38 U.S.C. § 5904(c)(1)

Congress has consistently limited the fees that attorneys can charge when they represent veterans. Fee restrictions started with an 1862 law that prohibited attorneys from charging veterans more than $5 to help with their claims.[27] That cap rose 2 years later, when Congress doubled the amount that an attorney could charge. This $10 fee limit remained the law for over a century, even

---

[19] R. at 562.

[20] R. at 231.

[21] R. at 396-401.

[22] R. at 345.

[23] R. at 88.

[24] R. at 113-14, 103, 88-91.

[25] R. at 97.

[26] R. at 66.

[27] *See Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305 (1985).

surviving a challenge at the Supreme Court in 1985 in *Walters v. National Association of Radiation Survivors*.[28] The *Walters* decision said that "Congress' principal goal" with the fee limitation was "wanting the veteran to get the entirety of the award."[29] The decision also confirmed that the fee limitation didn't violate the Due Process Clause of the Fifth Amendment.[30]

At the time of the *Walters* decision, the sun was about to set on the so called "'splendid isolation'"[31] between VA claims and judicial review. In 1988, Congress passed the Veterans' Judicial Review Act (VJRA)—which, on top of creating this Court—allowed attorneys to charge fees for work on a claim after the Board made a final decision in the case.[32]

Then in 2006, Congress changed the rules again—this time permitting attorney fees for work performed before the Board's decision but after a claimant filed an NOD.[33] And most recently, under the AMA, Congress unlocked the gate earlier in the claims process with the newest version of § 5904—now prohibiting fees for work performed before the initial decision.[34]

In updating the language of § 5904(c)(1), Congress altered the phrase "the date on which *an [NOD] is filed* with respect to the case" to instead say "the date on which *a claimant is provided notice of the [AOJ's] initial decision . . .* with respect to the case."[35] But Congress didn't define or

---

[28] *Walters*, 473 U.S. 305.

[29] *Walters*, 473 U.S. at 326.

[30] *Walters*, 473 U.S. at 306.

[31] *Brown v. Gardner*, 513 U.S. 115, 122 (1994) (citation omitted).

[32] Pub. L. No. 100–687, 102 Stat. 4105 (1988) (codified at scattered sections of 38 U.S.C.). *See also Mil.-Veterans Advoc. v. Sec'y of Veterans Affs.* (*MVA*), 7 F.4th 1110, 1135 (Fed. Cir. 2021).

[33] 38 U.S.C § 5904(c)(1) (Supp. IV 2017).

[34] 38 U.S.C § 5904(c)(1) (2018).

[35] *Compare* 38 U.S.C. § 5904(c)(1) (Supp. IV 2017)

(Except as provided in paragraph (4), in connection with a proceeding before the Department with respect to benefits under laws administered by the Secretary, a fee may not be charged, allowed, or paid for services of agents and attorneys with respect to services provided before the date on which a notice of disagreement is filed with respect to the case. The limitation in the preceding sentence does not apply to fees charged, allowed, or paid for services provided with respect to proceedings before a court.),

*with* 38 U.S.C. § 5904(c)(1) (2018)

(Except as provided in paragraph (4), in connection with a proceeding before the Department with respect to benefits under laws administered by the Secretary, a fee may not be charged, allowed, or paid for services of agents and attorneys with respect to services provided before the date on which a claimant is provided notice of the agency of original jurisdiction's initial decision under section 5104 of this title with respect to the case. The limitation in the preceding sentence does not apply to

elaborate on the term "initial decision" and retained the phrase "with respect to the case."[36] The major difference to § 5904(c)(1) under the AMA is that an attorney can charge fees once a claimant receives notice of the initial decision.

The upshot: in incremental steps, Congress keeps altering the triggering event for when advocates can charge fees. Bit by bit, Congress has permitted advocates to charge fees earlier in the process, but it has retained limitations.[37]

### B. Caselaw Addressing "with respect to the case"

The Court doesn't interpret section 5904 fresh because there's a depth of legal understanding built into that statute. Although the AMA overhauled VA's claim and appeal system, it didn't overhaul the merits of all that came before it. Combined, there are a handful of cases from our Court and the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) that consider the language of section 5904 that predates the AMA. These cases help steer the Court's merits analysis into how to understand "with respect to the case" in section 5904. Recall that this phrase "with respect to the case" has remained a constant; it's one that Congress used both before and in the AMA. So given that decisive caselaw existed before the AMA, there was a settled understanding of what "with respect to the case" meant. And since there's a settled understanding of the phrase, the burden is on appellant to prove that it means something different under the AMA. In other words, since the language "with respect to the case" didn't change, appellant's walk through the *Chevron* steps is more like an uphill climb.

In *Cameron v. Shinseki*, the Court zoomed in on the phrase "with respect to the case" to determine whether a claim for an increased rating is part of the same "case" as the initial claim for service connection.[38] The Court determined that they're different cases, reasoning that "although a claim for an increased rating . . . 'directly relate[s] to and stem[s] from the veteran's service connection claim,' it contains a separate essential element from an initial service connection claim: an increase in the level of disability that occurs after the record before the Board has closed."[39]

---

fees charged, allowed, or paid for services provided with respect to proceedings before a court.).

[36] *Compare* 38 U.S.C. § 5904(c)(1) (Supp. IV 2017), *with* 38 U.S.C. § 5904(c)(1) (2018).

[37] *See MVA*, 7 F.4th at 1135-36.

[38] *Cameron v. Shinseki,* 26 Vet.App. 109 (2012), *aff'd*, 561 F. App'x 922 (Fed. Cir. 2014).

[39] *Cameron*, 26 Vet.App. at 116.

While similar, the two are distinct cases since they depend on different evidence. In short, the term "case" as it appears in § 5904(c)(1) refers "to all potential claims raised by the evidence during the processing of the claim in question."[40] So the *Cameron* Court held, and the Federal Circuit confirmed, that § 5904(c)(1), as it then existed, didn't authorize payment of fees for work done before the claimant had filed an NOD for her increased rating claim.[41] And since the AMA version of § 5904(c)(1) retains the phrase "with respect to the case," the Court looks to *Cameron* for guidance. To sum up *Cameron*: different claims constitute different cases.[42]

*Cameron* considered and applied the Federal Circuit's decision in *Jackson* (*Francis*) *v. Shinseki*.[43] In *Jackson* (*Francis*), the Federal Circuit affirmed this Court's decision that essentially denied attorney fees.[44] The Federal Circuit held that a request for a total disability rating based on unemployability (TDIU) contained an element—unemployability—that is "separate and apart" from an increased rating claim and was a different "case" under § 5904(c)(1).[45] The court found that there was no evidence of unemployability of record at the time of the earlier claim.[46] In the end, under *Jackson* (*Francis*), because TDIU is distinct from an increased rating, a claimant or the evidence must raise the issue for it to be part of the same "case."

Recently, the Federal Circuit decided two cases reviewing § 5904(c)(1)—one precedential and one nonprecedential. Neither case controls our analysis here, but they shed considerable legal light. The newer of the two cases—*Perciavalle v. McDonough*—reversed this Court's decision.[47] The Federal Circuit explained that, in *Jackson* (*Francis*), it took "a broad view of the term [case]" and included all potential claims raised by the evidence.[48] As a result, the Federal Circuit determined that the AOJ's grant of TDIU, nearly a decade after the initial claim, related to the

---

[40] *Cameron*, 26 Vet.App. at 115; *see also Gumpenberger v. McDonough* (*Gumpenberger I*), 35 Vet.App. 195, 208-09 (2022), *aff'd*, *Gumpenberger II*, No. 2022-1887, 2024 WL 1252327 (Fed. Cir. Mar. 25, 2024).

[41] *Cameron*, 26 Vet.App. at 116-17.

[42] *Cameron*, 26 Vet.App. at 116.

[43] *Cameron*, 26 Vet.App. at 116-17 (reviewing *Jackson* (*Francis*) *v. Shinseki,* 587 F.3d 1106 (Fed. Cir. 2009)).

[44] *Jackson*, 587 F.3d at 1111.

[45] *Jackson*, 587 F.3d at 1111.

[46] *Jackson*, 587 F.3d at 1111.

[47] *Perciavalle v. McDonough*, 101 F.4th 829, 839 (Fed. Cir. 2024).

[48] *Perciavalle*, 101 F.4th at 836.

7

same initial "case" for service connection because the claimant raised it as part of his appeal. The rule gleaned from *Perciavalle* is that, a claim may morph and expand as an appeal, to include TDIU, at the Agency and can all be the same "case." What the Federal Circuit didn't explicitly say in *Perciavalle*, but is worth commenting on, is that the initial claim was, in a sense, continuously pursued and never final. So because finality never attached, later in time events related to the appeal are part of the initial claim—making it all the same case. So to sum up *Perciavalle*: the same Agency appeal constitutes the same case.

The Federal Circuit's nonprecedential decision in *Gumpenberger v. McDonough* affirmed the Court's interpretation of "the case" to determine that an agent wasn't owed fees when he hadn't filed an NOD "with respect to the case."[49] While the decision isn't precedential, we rely on it for its persuasive authority. Notably, the Federal Circuit confirmed that, even when Congress changes the triggering event that justifies an award of attorney fees, our understanding of what "the case" is doesn't change.[50] In other words, how to interpret "with respect to the case" from § 5904(c)(1) (2006) remains the same despite Congress's adjusting the point of entry for when an advocate may earn fees.[51]

### C. A Claim for an Increased Rating is a New Claim

Related to our understanding of what constitutes a case, in *Fenderson v. West*, the Court considered whether a claim for an increased rating is distinct from an original claim on the same disability.[52] Again, the Court focused on the different evidence needed for the original rating and an increased rating.[53] And it concluded that "[a] claim for an increased rating is a new claim."[54] The Court clarified that an increased rating claim isn't the same as appealing an initial rating by submitting an NOD—in that scenario, a claimant would want to submit evidence of the disability

---

[49] *Gumpenberger II*, 2024 WL 1252327, at *2.

[50] *Gumpenberger II*, 2024 WL 1252327, at *5.

[51] *See Gumpenberger II*, 2024 WL 1252327, at *5.

[52] *Fenderson v. West*, 12 Vet.App. 119 (1999).

[53] *Fenderson*, 12 Vet.App. at 126.

[54] *Fenderson*, 12 Vet.App. at 125 (citing *Suttmann v. Brown*, 5 Vet.App. 127, 136 (1993)).

8

since the original claim.[55] That same evidence wouldn't necessarily justify a later increased rating claim, particularly since VA can assign staged ratings.[56]

### D. Supplemental Claims

The AMA created the "supplemental claim," and the Court's understanding of the supplemental claim is still developing. A supplemental claim is a request for benefits filed by a claimant (1) "who had previously filed a claim" (2) "for the same or similar benefits" (3) "on the same or similar basis."[57] As envisioned by Congress, supplemental claims now serve as one of three options that a claimant has to seek administrative review, the other two consisting of a request for higher-level review by the AOJ or an NOD appealing to the Board—replacing the sole option under the legacy system: the NOD.[58] But supplemental claims, at least in substance, are old hat to VA.

The substance of a supplemental claim has existed in different forms since 1988 as a method of reopening a once decided claim by submitting new and material evidence.[59] The AMA contemplates supplemental claims to readjudicate a claim when more than a year has passed since the AOJ's decision and a claimant submits new and relevant evidence.[60] But the AMA also allows for a supplemental claim under 5104C(a) that must be filed within a year of the AOJ's decision.[61] When continuously pursued, a successful 5104C(a) supplemental claim can preserve the original application date as the effective date.[62]

So a supplemental claim can take multiple forms. A supplemental claim can reengage VA to address a benefit once denied, and a supplemental claim can continuously pursue an initial

---

[55] *See Fenderson*, 12 Vet.App. at 126.

[56] *See Fenderson*, 12 Vet.App. at 126.

[57] 38 U.S.C. § 101(36).

[58] 38 U.S.C. § 5104C.

[59] 38 U.S.C. § 5108 (2016); *see also MVA*, 7 F.4th at 1134 (recognizing that supplemental claims replaced legacy claims to reopen).

[60] 38 U.S.C. § 5104C(b).

[61] *Compare* 38 U.S.C. § 5104C(a)(1)(b), *with* 38 U.S.C. § 5104C(b).

[62] 38 U.S.C. § 5110(a)(2)(B); *MVA*, 7 F.4th at 1134; *Calhoun v. McDonough*, 37 Vet.App. 96, 103 (2024).

claim. In either scenario, the claimant filing the supplemental claim must have "previously filed a claim for the same or similar benefits on the same or similar basis."[63]

### E. *MVA*

With an understanding of the Court's caselaw addressing 38 U.S.C. § 5904(c)(1) in the legacy system, and a snapshot into the changed law under the AMA surrounding supplemental claims, the Court now turns to the Federal Circuit's decision in *MVA*.[64] In *MVA*, the Federal Circuit reviewed a facial regulatory challenge to several of VA's AMA regulations through 38 U.S.C. § 502, meaning the case didn't work its way to the Federal Circuit through the Agency or this Court. Relevant here, the Federal Circuit invalidated 38 C.F.R. § 14.636(c)(1)(i), a regulation that authorized attorney fees for supplemental claims only when the supplemental claim was filed within a year of the initial decision.[65] The Secretary asks the Court to avoid splicing what remains from § 14.636(c)(1)(i) since doing so would "be to render an advisory opinion[,] which the Court should avoid."[66] Here we must correct the Secretary—the Federal Circuit held that treating supplemental claims differently for fees based on whether a claimant filed within a year of the initial decision violates 38 U.S.C. § 5904(c)(1). In *MVA*, the Federal Circuit invalidated all of 38 C.F.R. § 14.636(c)(1)(i).[67]

*MVA* instructs on how to view supplemental claims, specifically noting that supplemental claims "have replaced claims to reopen from the legacy system."[68] But the decision doesn't contemplate claims for increased ratings. And it certainly doesn't categorize claims for increased ratings as supplemental claims. What's more, *MVA* doesn't answer what is an initial decision under § 5904(c)(1).[69]

---

[63] 38 U.S.C. § 101(36).

[64] *MVA*, 7 F.4th 1110.

[65] *MVA*, 7 F.4th at 1141.

[66] Secretary's Br. at 18-19.

[67] *MVA*, 7 F.4th at 1141 ("For these reasons, we hold that § 14.636(c)(1)(i) is contrary with the plain and ordinary meaning of § 5904(c)(1), and we thus invalidate that regulatory provision.").

[68] *MVA*, 7 F.4th at 1133.

[69] *MVA*, 7 F.4th at 1138.

10

## F. *Held*

In *Held v. McDonough*,[70] the Court interpreted the AMA version of 38 U.S.C. § 5904(c) when a claimant succeeds in proving clear and unmistakable error (CUE) in a prior decision. The takeaway? The pivotal "initial decision" in the CUE context is the one at the center of the successful CUE challenge—not the subsequent adjudication.[71] So the original decision that a claimant is attacking is the initial decision—not the decision that decides that VA committed a CUE.[72] The Court emphasized the long history of section 5904 in paying attorneys for reopening and readjudication, which included when based on CUE.[73] And the *Held* Court did not suggest that the AMA had changed the phrase "initial decision . . . with respect to the case."

But *Held*, like *MVA*, is merely instructive because CUE motions are unique.[74] Plus, the Court's review in *Held* centered on a more specific regulatory provision that doesn't apply here.[75]

## G. Interlude

The Court pauses for a minute. The legal landscape is broad and dense, but it doesn't solve the central questions to this appeal. So the Court now shifts its focus in this section from what's settled to how the Court scrutinizes a statute and reviews a Board decision. To recap, here's where we stand: (1) Congress, despite changing the entry point for when an attorney can charge fees, has consistently used the phrase "with respect to the case"; (2) there was a settled understanding of what the phrase "with respect to the case" meant before the AMA; and (3) when Congress passed the AMA, it retained the phrase "with respect to the case. . . ."

## H. Statutory Interpretation

Statutory interpretation analysis begins with the text of the statute to determine whether the language is plain and unambiguous. This is a well-known tenet of *Chevron*, the case the parties rely on to buttress their arguments about section 5904.[76] *Chevron* is essentially a judicial shorthand

---

[70] *Held v. McDonough*, 37 Vet.App. 28 (2023).

[71] *See Held*, 37 Vet.App. at 33.

[72] *See Held*, 37 Vet.App. at 33.

[73] *Held*, 37 Vet.App. at 35.

[74] *See George v. McDonough*, 596 U.S. 740, 747 (2022) (noting CUE's uniqueness to veterans benefits since the term CUE "appears nowhere else in the entire United States Code.").

[75] *Held*, 37 Vet.App. at 30.

[76] The Supreme Court of the United States is considering two cases that ask whether *Chevron* should be overruled or clarified. *Relentless, Inc. v. Dep't of Com.*, No. 22-1219 (U.S. argued Jan. 17,

for how to review a statute and any agency regulations made to further the law's purpose or to clarify the law's meaning. *Chevron* helps the Court analyze whether Congress—through its legislation—provided an answer to the current legal dispute. That is, did Congress speak to the issue at the center of the dispute, and if so, what did Congress say about it?[77]

When there's no ambiguity in the law, the Court gives effect to the expressed intent of Congress—*Chevron* step one. To answer the step one question—Is the law ambiguous?—the Court applies traditional judicial tools to consider the meaning of the law.[78] These judicial tools, also dubbed canons of interpretation or canons of construction, are a set of rules and presumptions to help judges decipher the meaning of a law. If the Court, however, finds that the law is ambiguous, then there's a detailed second step. *Chevron* step two focuses on whether the agency, VA here, could resolve the ambiguity, and if so, how it resolved the ambiguity and whether its interpretation of the ambiguity was reasonable.[79] In this matter, as explained below, the Court need not stray from *Chevron* step one because the meaning of the statute is clear.

## I. Standard of Review

The Court reviews the Board's analysis on legal questions de novo.[80] The meaning of a statute is a legal question,[81] so the Court will review the Board's legal analysis on what's the initial

---

2024); *Loper Bright Enters. v. Raimondo*, No. 22-451 (U.S. argued Jan. 17, 2024). Though both cases involve statutory silence, that isn't the case here.

[77] *Chevron*, 467 U.S. at 842-43. ("First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

[78] *Chevron*, 467 U.S. at 843 n.9. *See also INS v. Cardoza–Fonseca,* 480 U.S. 421, 449 (1987) (using "ordinary canons of statutory construction" to determine whether Congress had a clear intent).

[79] *Chevron*, 467 U.S. at 843 ("If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.").

[80] *Van Dermark v. McDonough*, 34 Vet.App. 204, 210 (2021), *aff'd sub nom. Dermark v. McDonough*, 57 F.4th 1374 (Fed. Cir. 2023).

[81] *Casey v. Wilkie*, 31 Vet.App. 260, 265 (2019) ("Statutory interpretation is a pure question of law that the Court reviews de novo.").

decision under 38 U.S.C. § 5904(c) de novo. [82] The Court reviews the Board's factual determinations under the clearly erroneous standard.[83]

### III. PARTIES' ARGUMENTS

#### A. Appellant's Argument

Appellant argues that she's entitled to fees because she provided services *after* the initial decision in the relevant case, which she says is the March 2008 rating decision. She challenges the Board's conclusion that the December 2021 decision was the initial decision in the case under the statute, arguing that Mr. Lovier's September 2021 submission was a supplemental claim under the AMA. She reasons that, since Mr. Lovier sought "more compensation for the same service-connected disability," the September 2021 submission was a claim for the same or similar benefits on the same or similar basis.[84]

Reduced to its essence, appellant argues that Congress used the AMA to "replace[] the concept of claims for an increased rating with supplemental claims."[85] Appellant's read of the AMA is the linchpin to her appeal because she concedes that, under the legacy system's rules, she wouldn't be entitled to past-due fees.[86] All the same, appellant points to *MVA* and argues that it instructs the Court to find that she's entitled to past due fees given her work with Mr. Lovier's supplemental claim.[87]

#### B. Secretary's Argument

The Secretary argues that the Board got it right: Mr. Lovier's September 2021 submission was a claim for an increased rating, so the December 2021 rating decision was the initial decision

---

[82] De novo review means that this Court will review the Board's determination without giving it any deference. *See Hensley v. West,* 212 F.3d 1255, 1263–64 (Fed. Cir. 2000).

[83] *Gilbert v. Derwinski*, 1 Vet.App. 49, 52 (1990). Under this standard of review, the Court must affirm the Board's findings so long as there is plausible support for them in the record.

[84] Appellant's Br. at 10.

[85] Appellant's Br. at 6.

[86] Oral Argument (OA), *Jackson (Alexandra) v. McDonough*, U.S. Vet. App. No. 22-3528 (argued Mar. 7, 2024), https://www.youtube.com/watch?v=SjVwTLhSV-o at 6:24-6:40.

[87] Appellant's Br. at 14 (arguing that Board's decision "'contravenes § 5904(c)(1)'s requirement that paid representation be available for all forms of administrative review under the AMA.'" (quoting *MVA*, 7 F.4th at 1140)); *see also* OA at 14:33-15:33.

on that increased rating claim.[88] He relies on *Chevron* and explains that the Agency's regulation, 38 C.F.R. § 3.1(p)(1)(ii), filled a gap in understanding the AMA. The Secretary notes that Mr. Lovier submitted his request for an increase using a Form 21-526EZ, Application for Disability Compensation and Related Compensation Benefits, instead of a supplemental claim form.[89]

The crux of the Secretary's argument is that a supplemental claim focuses on administrative review, while increased rating claims prompt VA to review new facts.[90] Thus, the Secretary says that here, since Mr. Lovier's disability worsened, the facts and record changed, meaning that appellant was not disagreeing with a prior rating decision and didn't seek readjudication of a previously denied claim.[91]

## IV. ANALYSIS

### A. The September 2021 Submission Is a New Claim, Not a Supplemental Claim

The Court's task is to decide whether appellant is entitled to fees resulting from the December 2021 rating decision under 38 U.S.C. § 5904(c)(1). To get there, the Court has a couple of initial subtasks. First, the Court must categorize the September 2021 submission. For that job, the Court has to answer whether the September 2021 submission is a supplemental claim. And to answer that question, the Court will use several statutory interpretive tools. Then, once the Court categorizes the September 2021 submission, the ultimate task of deciding eligibility under 38 U.S.C. § 5904(c)(1) falls into place.

Appellant argues that the Board erred since the September 2021 submission was a supplemental claim. But the Board got it right: Mr. Lovier's claim wasn't a supplemental claim. Between the plain language, the AMA's structure, established caselaw, and Congressional practice, the Court is confident that Congress meant for the September 2021 submission to be a new claim.

---

[88] First, the Secretary urges the Court to exercise its discretion and decline to address appellant's argument that the September 2021 claim was a supplemental claim because she raised it for the first time on appeal. Secretary's Br. at 11-12. Invoking issue exhaustion isn't appropriate here since the Court has a novel legal question that requires deep statutory analysis. 38 U.S.C. § 7261(a)(1).

[89] Secretary's Br. at 15.

[90] OA at 42:10-42:27.

[91] Secretary's Br. at 14-15.

To help frame our analysis, it's worth revisiting the legal landscape. Bit by bit, Congress changed when an attorney can start charging fees for work performed before VA. Despite changing the fee entry point for attorneys, Congress continued to retain the phrase "with respect to the case" when it drafted new legislation. Before the AMA, Courts interpreted the phrase "with respect to the case" and provided a settled understanding. Built into that settled understanding is that a claim for an increased rating is a new claim. In fact, the understanding is so settled that appellant concedes that she wouldn't prevail under the legacy system precedent.[92]

We assume Congress was aware of our and the Federal Circuit's precedent analyzing the phrase "with respect to the case." To reach this assumption, we use our first judicial tool: Congress makes laws with knowledge of precedent.[93] And, as already observed, Congress retained the phrase "with respect to the case" in the AMA. So we next use our second judicial tool—legislative acceptance—and likewise presume that Congress intended for the settled understanding of the phrase to continue with the new legislation.[94] What's more, we also presume that Congress legislates with knowledge of how our Court will analyze the law.[95]

So in short, appellant needs to show how, without changing the text of the statute, Congress changed the meaning of the phrase "with respect to the case." That's a tall task because the most obvious way to change the law is to change its words. To tackle that challenge, appellant argues that the AMA's innovation—the supplemental claim—changes how to interpret the phrase "with respect to the case." Her overriding argument is that Mr. Lovier filed a supplemental claim in September 2021, which is part of the same case that began with his April 2007 claim for service connection. But the September 2021 submission isn't a supplemental claim; it's a new claim. We explain, starting with text.

---

[92] OA at 6:24-6:40.

[93] *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 176 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.").

[94] *United States v. Wells*, 519 U.S. 482, 495 (1997) ("Congress expects its statutes to be read in conformity with [court] precedents . . . ."); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 382 n.66 (1982) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change. So too, where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." (citations omitted)).

[95] *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496 (1991) ("Congress legislates with knowledge of our basic rules of statutory construction").

15

Our third judicial tool: a plain reading of the statute. Congress defined a supplemental claim as a "claim for benefits under laws administered by the Secretary filed by a claimant who had previously filed a claim for the same or similar benefits on the same or similar basis."[96] The Court will examine the definition one piece at a time and holistically.

For claimants to submit a supplemental claim, they must've "previously filed a claim."[97] Here, aside from Mr. Lovier's September 2021 submission, the only other claim he filed was in April 2007 when he first requested service connection for his bilateral hip disability. VA granted that claim on March 27, 2008.[98] Yes, Mr. Lovier sought a higher initial rating in March 2009,[99] but he did so by *appealing* his service connection claim. That appeal became final in December 2018. And Mr. Lovier's increased rating through an agency appeal is a fact the Court can't ignore.

Because VA granted the April 2007 *claim*, Mr. Lovier doesn't have a claim for service connection to supplement—VA already granted him service connection. The September 2021 submission requested a higher rating, so it's distinct from the April 2007 claim, making it a request for a different benefit that wasn't the focus of the first claim. So the September 2021 submission seeking a higher rating is a different claim from the prior claim seeking service connection.

The basis for the claims was distinct too. Service connection claims turn on a nexus between a disability and an in-service injury. Claims for increase turn on the severity of a current disability. Given the factual changes—Mr. Lovier's hip surgery—VA's decision in September 2021 wasn't on the same or similar basis from the last time VA assessed his hip rating. Mr. Lovier's disability worsened, so VA engaged in a fresh analysis on the severity of his hip disability. True, that new analysis is colloquially a review of the rating, but to say that this review is the same as the technical administrative review offered by Congress[100] is a far too superficial view of the law. So the AMA's language—that supplemental claims must be filed for "the same or similar benefits

---

[96] 38 U.S.C. § 101(36).

[97] 38 U.S.C. § 101(36).

[98] R. 1524.

[99] R. at 1457.

[100] 38 U.S.C. § 5104C.

on the same or similar basis"—drives the Court's view that the September 2021 submission wasn't a supplemental claim.[101]

Fourth judicial tool: prior caselaw. And as discussed above, our caselaw in *Fenderson* holds that "[a] claim for an increased rating is a new claim."[102] In other words, since a request for an increased rating is a new claim, it's not "the same or similar benefit" despite relating to a claim for service connection. And again, we presume Congress knew this when enacting the AMA.[103]

Fifth judicial tool: holistic review of the AMA.[104] Appellant directs the Court to the AMA's updates to try to prove that the September 2021 submission is a supplemental claim. She compares the pre-AMA version to the enacted version in three places to bolster her argument, pointing to sections 5103, 5110, and 5111.[105] To begin, she highlights 38 U.S.C. § 5103 and says that Congress replaced the phrase "a claim for an increase in benefits" with "a supplemental claim."[106] But this is a surface level point. And in diving deeper—applying another handful of judicial tools—appellant's argument doesn't hold up.

Sixth judicial tool: titles of sections.[107] To start, section 5103, based on its title— "Notice to claimants of required information and evidence"—outlines what kind of notice VA must provide under the AMA. Appellant's compare and contrast of the statute in section 5103 tips towards her interpretation. But Congress's specific change to notice speaks squarely to notice.[108] Yes, the Court presumes consistency with terms and the law generally, but an amendment focused on notice doesn't override other sections of the AMA.

---

[101] 38 U.S.C. § 101(36).

[102] *Fenderson*, 12 Vet.App. at 125.

[103] *Goodyear Atomic Corp.*, 486 U.S. at 176.

[104] *See Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 595 U.S. 178, 185 (2022) (looking to how "nearby statutory provisions" use a specific word); *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) ("Statutory construction 'is a holistic endeavor,' and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter." (quoting *United Sav. Ass'n. of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988))).

[105] Appellant's Br. at. 8-9.

[106] Appellant's Br. at 8.

[107] Titles and headings are not dispositive but help. *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) ("'[T]he title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute." (quoting *Brotherhood of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 529 (1947))).

[108] *See Dubin v. United States,* 599 U.S. 110, 119-20 (2023) (using a section's title to adopt a narrower, targeted reading of the statute).

What's more, appellant doesn't explain why "original claim" under 38 U.S.C. § 5103 doesn't include claims for increase. Congress turned three terms into two; so without explaining why a claim for increase isn't an original claim—at least when first made and not continuously pursued—the Court doesn't see how 38 U.S.C. § 5103 proves appellant's argument. Seventh judicial tool: harmony within the law.[109] Appellant next points to 38 U.S.C. § 5110, making a similar argument. She contends that, under the AMA, "a supplemental claim subsumes both claims reopened after final adjudication and claims for increase."[110] But 38 U.S.C. § 5110 splinters the premise that Congress replaced increased rating claims with supplemental claims. Because, if that were the case, then there's a conflict with the law establishing the effective dates of awards.

Let us explain. Congress treated effective dates for awards based on supplemental claims differently than awards for increased compensation. And with effective dates, Congress provided considerable statutory detail. Under 38 U.S.C. § 5110, Congress established how to assign an effective date for (1) a benefit on a claim continuously pursued through a supplemental claim,[111] (2) a supplemental claim received more than 1 year after the date of denial,[112] and (3) awards for increased compensation.[113] So, when Congress created effective dates, it differentiated supplemental claims from increased compensation claims—cutting against them being the same.[114] And Congress separated supplemental claims and increased compensation claims for good reason: increased compensation claims allow for a 1-year look back.[115]

If the Court accepted appellant's argument that the September 2021 submission was a supplemental claim, then Mr. Lovier loses the potential 1-year look back with his effective date. Appellant fails to show that Congress intended that the 1-year prior language for effective dates

---

[109] *Mkt. Co. v. Hoffman,* 101 U.S. 112, 115–16 (1879) ("'[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be . . . insignificant'" (citation omitted)).

[110] Appellant's Br. at 9.

[111] 38 U.S.C. § 5110(a)(2).

[112] 38 U.S.C. § 5110(a)(3).

[113] 38 U.S.C. § 5110(b)(3).

[114] *See, e.g.*, *Lindh v. Murphy*, 521 U.S. 320, 336 (1997) (favoring a reading that "accords more coherence" to the disputed statutory provisions).

[115] 38 U.S.C. § 5110(b)(3).

18

shouldn't apply to Mr. Lovier's September 2021 submission. And the Court won't override Congress's demand to look for an effective date up to 1 year before the date of claim.[116]

Eighth judicial tool: statutory structure.[117] Finally, the Court looks to 38 U.S.C. § 5111— what appellant calls "an outlier"[118] in the statutory scheme. But what appellant views as an outlier is from another perspective statutory consistency. That is, like in 38 U.S.C. § 5110, Congress used different provisions to separate the law for supplemental claims from awards based on an increase in disability or disability rating.[119]

Ninth judicial tool: Congress doesn't make significant policy changes cryptically.[120] Congress wouldn't have flipped over the apple cart so covertly. That is, had Congress intended for a supplemental claim to replace the increased rating claim, it would've made that change self-evident within the AMA: either when it defined the term supplemental claim under 38 U.S.C. § 101(36), when it defined claims under 38 U.S.C. § 5100, or when it provided specific provisions for supplemental claims under 38 U.S.C. § 5108. Said otherwise, we assume that, if Congress intended for the supplemental claim to fully replace the increased rating claim, then it would be obvious in the AMA and not crammed in a notice section.

The judicial tools clarify how to view a supplemental claim. On balance, the canons of statutory interpretation and construction that the Court employs at *Chevron* step one show that appellant's September 2021 submission isn't a supplemental claim.[121] The above analysis now helps decide the ultimate question: When was the "initial decision . . . with respect to the case?"

---

[116] *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty 'to give effect, if possible, to every clause and word of a statute.'" (citation omitted)).

[117] *Welcome v. Wilkie*, 33 Vet.App. 77, 80 (2020) (instructing that the Court can look to the "structure of the law itself" when gleaning statutory meaning).

[118] Appellant's Br. at. 9.

[119] *Compare* 38 U.S.C. § 5110(d)(1), *with* 38 U.S.C. § 5110(d)(2).

[120] *See generally Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."). Granted, the elephants in mouseholes doctrine is more often used when reviewing the authority Congress delegated, but the premise still persuades the Court. Had Congress replaced the increased rating claim with the supplemental claim—a major shift to the inner workings of the veterans benefits system—the change would be self-evident. *See Keene Corp. v. United States*, 508 U.S. 200, 209 (1993) ("[W]e do not presume that the revision worked a change in the underlying substantive law "unless an intent to make such [a] chang[e] is clearly expressed." (citing *Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 227 (1957))).

[121] And because the Court holds that the September 2021 submission isn't a supplemental claim, *MVA*'s instructions on how to view supplemental claims provide little guidance.

19

B. The December 2021 Rating Decision Is the Initial Decision

We circle back to reuse some of our judicial tools. Remember, we presume that when Congress retains particular phrases in the law when it enacts new laws, it does so because it intends to bring with it any settled understanding of the phrase. And we also presume that Congress would effectuate a change in the law through conspicuous action. What's more, appellant fails to show that Congress even considered changing the meaning of how to interpret "with respect to the case." Tenth judicial tool: Congress's silence has meaning. Congress didn't consider whether to change the key term—"with respect to the case." Said otherwise, the dog didn't bark.[122] Finally, the Supreme Court instructs that "courts must be cautious before adopting changes that disrupt the settled expectations of the . . . community."[123] All told, appellant has failed to show that our understanding of the phrase "with respect to the case" under § 5904(c)(1) changes as a result of Congress creating the supplemental claim. In other words, the old isn't outdated and isn't *old* at all. What's old is what's current. *Cameron* answers the legal question under the AMA, much as it did under the legacy system.[124]

As noted above, in *Cameron* we held that a claim for an increased rating isn't the same "case" as the initial claim for service connection.[125] And we've established that Mr. Lovier's September 2021 submission isn't a supplemental claim. Thus, the "initial decision . . . with respect to the case" is the December 2021 rating decision. And since attorney fees under § 5904(c)(1) are only available for work performed after an initial decision, Mr. Lovier doesn't owe fees to appellant for work performed before the initial decision in December 2021.

---

[122] The "dog didn't bark" canon derives from a short story from Sir Arthur Conan Doyle in which Sherlock Holmes deduces the identity of the villain after realizing that the dog of the house did not bark when the individual came to the house. *See* SIR ARTHUR CONAN DOYLE, *The Adventure of Silver Blaze*, *in* THE COMPLETE SHERLOCK HOLMES 347 (A.C. Doyle Memorial ed. 1960). The Supreme Court has also used this canon of statutory construction. *See, e.g.*, *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Ed.*, 550 U.S. 81, 88 (2007); *Scheidler v. Nat'l Org. for Women*, 547 U.S. 9, 20 (2006).

[123] *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 739, (2002) (reiterating its guidance from *Warner–Jenkinson Co. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 29 (1997), that Congress can legislate and change judicial doctrine any time it chooses).

[124] Given the Board's December 2018 decision reviewing appellant's appeal for a higher initial rating, the circumstances here are distinct from *Perciavalle*: the initial appeal ended, and we have a new claim.

[125] *Cameron*, 26 Vet.App. at 116.

One final point before we conclude. Appellant also argues that the Board erred because it relied on a regulation that the Federal Circuit invalidated in *MVA*.[126] She makes a good point: Board members shouldn't cite regulations in their decisions that have no force of law. But given our analysis of the enabling statute—38 U.S.C. § 5904(c)—we hold that the Board correctly applied the statute. Yes, the Board's decision could've been more polished and ideally wouldn't have cited 38 C.F.R. § 14.636(c)(1)(i).[127] But getting to the correct legal outcome in a less than perfect manner is the epitome of a harmless error.[128] The Board got it right. It identified the September 2021 submission as a new claim and determined that the December 2021 decision was the "initial decision . . . with respect to the case"[129]—that's all the Board needed to do.

Our decision today doesn't break much new ground by confirming that under the AMA, an increased rating is still distinct from the initial claim. While the September 2021 claim for an increased rating relates to Mr. Lovier's initial claim for service connection for a hip disability, the facts that supported his claim changed. His hip disability worsened, so he filed a new claim.

This outcome also tracks with the congressional purpose behind the AMA and the fee statutes. A claimant has varying options to seek administrative review, and a supplemental claim is one of those options. Appellant cautions that, if an increased rating isn't treated as a supplemental claim, then claimants may inadvertently lose the chance to preserve their effective date by requesting an increased rating within 1 year of a rating decision.[130] But the changes Congress made to the fee statute permit paid representation after the initial decision. With the increased choices available to claimants who've received an initial decision, Congress made it so that attorneys and agents can help navigate the next steps.

---

[126] Appellant's Br. at 17-22.

[127] *See* R. at 5-6.

[128] *Shinseki v. Sanders*, 556 U.S. 396, 407-08, (2009) (analogizing the federal harmless-error standard under 28 U.S.C. § 2111 to the Court's instruction under 38 U.S.C. § 7261(b)(2) to "take due account of the rule of prejudicial error," and explaining that the rule "seeks to prevent appellate courts from becoming impregnable citadels of technicality" (citing *Kotteakos v. United States*, 328 U.S. 750, 759 (1946))). *Soyini v. Derwinski*, 1 Vet.App. 540, 546 (1991) (holding that strict adherence to the reasons-or-bases requirement is not warranted when it would impose additional burdens on the Board with no benefit flowing to appellant).

[129] R. at 6.

[130] Appellant's Br. at 13.

21

Our decision doesn't affect payment of fees when VA denies an increased rating claim but then grants a supplemental claim for an increased rating through continuous pursuit. While true that a claim for an increased rating under *Fenderson*[131] is a new claim, the supplemental claim speaks to the already denied claim, so past-due fees would be appropriate. VA's guidance in its *Appeals and Reviews, M21-5,* also follows this approach.[132] Our decision doesn't speak to fees for advocates who aid a claimant with their continuous pursuit of a claim or a rating assigned from a supplemental claim.

## V. CONCLUSION

For these reasons, the Court AFFIRMS that part of the Board's May 22, 2022, decision denying attorney fees paid from past-due benefits.

JAQUITH, *Judge*, dissenting: As the majority describes this case, "[i]f the September 2021 submission is a supplemental claim, then the March 2008 decision is the initial decision[133] with respect to the case, and [the] appellant likely prevails and can recover attorney fees under § 5904(c)(1)."[134] I agree. But we part ways over the answer to the determinative question—whether the veteran's September 2021 submission was a supplemental claim—so I respectfully dissent.

The AMA did not create the supplemental claim,[135] but it did broaden its scope. In section 101(36), Congress defined "supplemental claim" as "a claim for benefits under laws administered by the Secretary filed by a claimant who had previously filed a claim for the same or similar benefits on the same or similar basis."[136] What happened here fits perfectly within that definition.

---

[131] *Fenderson*, 12 Vet.App. at 125.

[132] VA APPEALS AND REVIEWS, M21-5, ch. 8, sec. A(1)(i), https://www.knowva.ebenefits.va.gov/system/templates/selfservice/va_ssnew/help/customer/locale/en-US/portal/554400000001018/content/554400000205495/M21-5-Chapter-8-Section-A-Introduction-to-Fees#1 (Dec. 12, 2023).

[133] The initial decision is the one "[h]appening or being at the very beginning; first." *Initial*, WEBSTER'S II NEW COLLEGE DICTIONARY 570 (2001).

[134] *Ante* at 2.

[135] *Cf. ante* at 9.

[136] 38 U.S.C. § 101(36).

*From Bilateral Avascular Necrosis of the Femoral Heads to Hip Replacements*

John A. Lovier served in the U.S. Army from February 1991 to April 1991, completing the Engineer Officer Basic Course,[137] and in the U.S. Navy from March 2004 to April 2007.[138] In the Navy, the veteran served as a physician specializing in obstetrics and gynecology.[139] Midway through his tour, his hips began to fail. "He had the onset of left hip pain with activity such as walking or turning in August or September, 2005," and "discontinued working as a physician" in October 2005, shortly after he started on crutches.[140] The veteran was diagnosed with bilateral avascular necrosis[141] of the femoral heads, and in December 2005, an orthopedic surgeon at the Naval Hospital in Charleston, South Carolina, referred him to Duke University Medical Center for treatment.[142] At that time, the veteran was walking "with a left lower extremity limp," and his right hip was aching, having been sore since the preceding month.[143] Dr. Lovier's left hip was more symptomatic, so a free vascularized fibular bone graft was performed on his left hip in December 2005, and the same surgery on his right hip was performed in February 2006.[144] The surgery involved dissection of the fibula with an oscillating saw, removal of avascular bone from the femoral head, and anchoring the graft with wire through the fibula and the femur.[145]

In April 2007, the veteran applied for disability compensation for avascular necrosis of the femoral heads in both hips.[146] He said he had "noted left groin pain while training for the [physical readiness test (PRT)] in [the] fall of 2005 (while on active duty)" and was diagnosed with and treated for bilateral avascular necrosis of the femoral heads of his hips while on active duty.[147]

---

[137] R. at 1189.

[138] R. at 1187.

[139] R. at 1187, 1197, 1977.

[140] R. at 1977.

[141] Avascular means "not supplied with blood vessels." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 181 (33d ed. 2020). Necrosis is "the sum of the morphologic changes indicative of cell death and caused by the progressive degradative action of enzymes; it may affect groups of cells or part of a structure or an organ." *Id.* at 1218.

[142] R. at 1977-78, 1992.

[143] R. at 1977.

[144] R. at 1978-79, 1984-85.

[145] R. at 1981-82, 1988-89.

[146] R. at 1942-43.

[147] R. at 1943.

23

In March 2008, a VA regional office (RO) granted service connection but with a noncompensable evaluation.[148] In February 2009, Dr. Lovier appointed a lawyer with Jackson & MacNichol as his representative.[149] In March 2009, the veteran's lawyer submitted the veteran's appointment form and a Notice of Disagreement (NOD) with the March 2008 decision denying the veteran disability compensation.[150] In May 2009, the veteran's lawyer submitted the contingent fee agreement signed by the veteran and his lawyer.[151]

The veteran requested de novo review,[152] and a November 2009 Statement of the Case reflects that a decision review officer assigned a 10% evaluation to each hip "[b]ased on the medical evidence showing painful motion of both hips."[153] The record indicates that the RO provided notice of that decision in December 2009, and the veteran's lawyer wrote the RO in August 2011, seeking the status of the veteran's claim because it had been quite some time since the veteran had heard from the RO.[154] In January 2013, the veteran saw a private orthopedic surgeon for progressively worse right hip pain.[155] Magnetic resonance imaging (MRI) confirmed that there were moderate degenerative changes in his right hip.[156] The MRI also showed some increasing avascular necrosis in both femoral heads.[157] These January 2013 records were provided to VA in May 2013, 6 days before the veteran's hearing on May 9, 2013. At the hearing, the veteran described the recovery period from his December 2005 and February 2006 surgeries, how his subsequent hip condition restricted his movement and limited his work and other activities, and his need to take prescription anti-inflammatory medication so he could function.[158] In response to a question about his hip condition being progressive, the veteran testified: "I'm going to need hip

---

[148] R. at 1525-26.

[149] R. at 1517.

[150] R. at 1516.

[151] R. at 1494-97.

[152] R. at 1457.

[153] R. at 1471-72, 1476.

[154] R. at 1387.

[155] R. at 1325.

[156] R. at 1323.

[157] R. at 1328.

[158] R. at 1343-48.

replacements in both hips . . . [in a]nywhere from five months to five years."[159] The veteran said his right hip was worse than his left hip, with "tightness" and "a rubbing, a pinching, kind of a grind" every time he moved it, while he endured a background ache in his left hip until he turned or pivoted without paying attention.[160]

Dr. Lovier had replacement surgery for his right hip in May 2015 and his left hip in February 2021.[161] From May 2015 through June 2016, he received a total disability rating based on his right hip replacement.[162] In August 2016, the veteran's right hip disability rating was decreased to 30%, effective July 1, 2016.[163]

In November 2020, the veteran was referred to a specialist for consideration of left hip replacement, but elective surgery was foreclosed by COVID-19 protocols.[164] He returned in February 2006 with "progressive worsening issues related to the left hip." *Id.* Imaging revealed "advanced degenerative changes"; a computed tomography scan showed "advanced left hip arthritis"; and an examination demonstrated decreased range of motion.[165] The veteran proceeded with left total hip replacement.[166] In September 2021, the appellant submitted Dr. Lovier's claim for disability compensation for his left hip.[167] As a result of the veteran's "contention[]" that he'd had his left hip replaced, VA directed that he be examined to "evaluate for the current level of severity of [his] service connected disability."[168]

In October 2021, a nurse practitioner examined the veteran for his "left hip condition."[169] On the disability benefits questionnaire used to conduct the examination, the nurse practitioner

[159] R. at 1353.

[160] R. at 1354.

[161] R. at 346, 360.

[162] R. at 776.

[163] *Id.*

[164] R. at 205.

[165] R. at 206-07.

[166] R. at 208, 231-36.

[167] R. at 397.

[168] R. at 395.

[169] R. at 346.

noted that the diagnoses associated with the veteran's left hip condition were his bilateral hip joint replacements and the surgeries for the avascular necrosis of his bilateral femoral heads.[170] [171]

Avascular necrosis, also known as osteonecrosis, is a progressive condition that is most common in the hip.[172] "There is no cure for avascular necrosis," so it "often requires surgery." *Id.* "Osteonecrosis of the femoral head is a progressive and debilitating condition," for which "[t]he only definitive treatment is total hip arthroplasty, although numerous treatments including disphosphonates and core decompression are used to delay the progression."[173] "Although patients are initially asymptomatic, avascular necrosis of the femoral head usually progresses to joint destruction, requiring total hip replacement (THR), usually before the fifth decade."[174]

In this case, the progressive nature of Dr. Lovier's hip disability was noted from the time of its diagnosis in 2005, when a Navy orthopedic surgeon wrote: "[Lieutenant Commander] John Lovier has been diagnosed with bilateral femoral head avascular necrosis. His left side is currently symptomatic while his right is considered asymptomatic. Both symptomatic and asymptomatic hips are likely to progress."[175] In January 2013, the veteran's private orthopedic surgeon noted progressively increasing right hip pain, restricted range of motion, and bilateral joint space narrowing.[176] In March 2013, the private orthopedic surgeon noted that imaging showed "some increasing avascular necrosis in both femoral heads," and that the surgeon "had a long discussion [with the veteran] that at some point he may be a candidate for a hip replacement."[177] In May 2013, Dr. Lovier highlighted that his condition was progressive when he testified that he was "going to

---

[170] R. at 346-47.

[171] Like the Board in December 2018, R. at 568, the nurse practitioner has the dates of the surgeries to address the avascular necrosis of Dr. Lovier's left and right femoral heads backwards. R. at 346-47. The "[l]eft free vascularized fibular graft to the left femoral head" was in December 2005, R. at 1981-83, and the "[r]ight free vascularized fibular graft to the right femoral head" was in February 2006, R. at 1987.

[172] Steven A. Olson, *Avascular Necrosis*, DUKEHEALTH, https://www.dukehealth.org/treatments/orthopaedics/avascular-necrosis (last updated May 22, 2023).

[173] G. George & J. Lane, *Osteonecrosis of the Femoral Head*, 6 J. Am. Acad. Orthopaedic Surgeons Glob. Rsch. & Revs. (May 2022), https://journals.lww.com/jaaosglobal/fulltext/2022/05000/osteonecrosis_of_the_femoral_head.2.aspx.

[174] Michael R. Aiello, *Avascular Necrosis (AVN) of the Femoral Head Imaging and Diagnosis*, MEDSCAPE, https://emedicine.medscape.com/article/386808-overview?form=fpf (last updated Dec. 27, 2021).

[175] R. at 1992.

[176] R. at 1325-26.

[177] R. at 1328.

need replacements in both hips . . . [in a]nywhere from five months to five years."[178] In June 2013, the private orthopedic surgeon noted that the veteran was experiencing "some degenerative changes and arthritis" and that the veteran's "right hip has progressively been getting worse for him with pain in the hip referred laterally."[179] Based on the progression of the veteran's hip disabilities, the Board remanded the veteran's claim for further development twice, in September 2013,[180] and November 2017.[181] And the Board acknowledged evidence of the progressive worsening of Dr. Lovier's hip disabilities even as the Board denied increased ratings in December 2018.[182]

*Satisfying the Statutory Definition of Supplemental Claim*

As the foregoing facts illustrate, the veteran's September 2021 claim is a supplemental claim as that term was defined by Congress in section 101(36). First, it was claim for disability compensation under 38 U.S.C. § 1110.[183] Second, Dr. Lovier had previously, in April 2007, filed a claim for the exact same benefit—disability compensation.[184] In September 2021, his lawyer even used an updated version of the same form used in April 2007.[185] Third, the later and previous claims were on a similar basis—both claims were based on the veteran's left hip condition. Moreover, the avascular necrosis of the left femoral head named in the veteran's April 2007 claim was the genesis for the left hip replacement named in the veteran's September 2021 claim.[186] And

---

[178] R. at 1353.

[179] R. at 1362.

[180] R. at 1302

[181] R. at 777.

[182] R. at 568.

[183] According to VA, in fiscal year 2023, there were 5,662,273 recipients of disability compensation and estimated annual payments totaling $133.09 billion. 2023 VETERANS BENEFITS ADMIN., ANN. BENEFITS REP. 73, https://www.benefits.va.gov/REPORTS/abr/. The Report lists total program obligations for compensation as $149,405 million, which is almost 90% of VBA's total program obligations. *Id.* at 7.

[184] R. at 1936-53.

[185] *Compare* R. at 396-400, *with* R. at 1936-53. The Secretary notes that "the form submitted by [the a]ppellant on the [v]eteran's behalf was not a supplemental claim form." Secretary's Br. at 15. But the Secretary has not rebutted the appellant's contention that "VA says file these things on a [VA Form 21-]526 . . . that's the form that they told people—advocates and veterans—to use." OA at 22:02-22:35. Nor has the Secretary indicated why the form would be determinative in light of VA's obligation to construe claimants' submissions sympathetically and consider claims reasonably raised, not merely as they are characterized or labeled. *See Wilson v. McDonough*, 35 Vet.App. 103, 108-10 (2022).

[186] R. at 397.

the progression of the veteran's left hip from his April 2007 disability level to that in September 2021 was foreseeable, generally foreseen from October 2005,[187] and specifically contemplated in early 2013.[188] In October 2021, the nurse practitioner affirmed that her diagnosis "is not different from the disability for which the [v]eteran is service connected[,] as the [v]eteran's current diagnosis has worsened and is a progression of the service connected disability."[189] It is hard to imagine claims more similar and connected than Dr. Lovier's.

The majority tries to drive a wedge between the initial and supplemental claims by characterizing the veteran's April 2007 claim as merely for service connection.[190] But Dr. Lovier's April 2007 claim explicitly states that it is for "compensation."[191] And the RO adjudicated it as such—not just finding service connection but also evaluating the veteran's hip disability for compensation (and finding it noncompensable).[192] The veteran's September 2021 claim likewise is for compensation.[193] Fairly read, both of these interrelated claims as seeking the highest rating the facts and law support, but both explicitly seek exactly the same thing: compensation for Dr. Lovier's left hip disability.

Though satisfying the AMA's statutory definition of supplemental claim should be sufficient, Dr. Lovier's September 2021 left hip replacement claim also fits in and wears the "old hat"[194] supplemental claim described in 38 U.S.C. § 5108—it presents new and relevant evidence requiring VA to readjudicate the claim taking into consideration all of the evidence of record.[195] Of course, the new and relevant evidence showed that the veteran's left hip had been replaced, so VA readjudicated the veteran's claim, awarding a temporary 100% disability rating, effective February 24, 2021, and then a 30% rating from August 1, 2021.[196] VA also granted service

---

[187] R. at 1992.

[188] R. at 1328, 1353.

[189] R. at 365.

[190] *Ante* at 16.

[191] R. at 1936.

[192] R. at 1524-25.

[193] R. at 394.

[194] *Ante* at 9.

[195] 38 U.S.C. § 5108(a).

[196] R. at 89.

connection for bilateral hip replacement scars, with non-compensable evaluations.[197]  In testament to the oneness of the veteran's hip conditions, VA granted service connection for the veteran's "right hip replacement scars as secondary to the service-connected disability of left total hip replacement," with the effective date of his left hip replacement.[198]

*The Undeniable Error in the March 2022 Board Decision*

Dr. Lovier's September 2021 supplemental claim finds a third statutory home[199] in 38 U.S.C. § 5104C(b)—it is a supplemental claim submitted more than 1 year after the AOJ decision—and that status highlights the undeniable error in the Board's May 2022 decision that is the subject of this appeal. The majority acknowledges that the Board erred, but the majority accepts the error as harmless because "[t]he Board got it right."[200] To get there, the majority minimizes the Board's error as a citation mistake that is less than ideal.[201] That characterization is overly generous and makes no mention of the Board's abject failure to fulfill its obligation to state adequate reasons or bases its findings and conclusions on all material issues.[202] The Board does not address, or indicate that it even recognized, the central issue the majority highlights—whether the veteran's September 2021 claim was a supplemental one. The apparent reason is the Board's stated belief, based on 38 C.F.R. § 14.636(c)(1)(i), that "[a] supplemental claim will be considered part of the earlier claim if the claimant has continuously pursued the earlier claim by filing . . . [the] supplemental claim, on or before one year after the date on which the AOJ issued a decision." [203]

---

[197] *Id*.

[198] *Id*.

[199] For good measure, Dr. Lovier's September 2021 claim is also a supplemental one under 38 C.F.R. § 3.1(p)(2) (2023), as a "claim for a VA benefit on an application form prescribed by the Secretary where an initial or supplemental claim for the same or similar benefit on the same or similar basis was previously decided." It identifies new evidence.  38 C.F.R. § 3.160(a)(6) (2023). And it generally satisfies 38 C.F.R. § 3.2501 (2023) as a supplemental claim presenting new and relevant evidence that "was not previously part of the actual record before agency adjudicators" and "tends to prove . . . a matter at issue in a claim," namely, the then-current state of the veteran's longstanding serious left hip disability. A supplemental claim such as the veteran's that presents such evidence implicitly disagrees that the veteran's existing rating is still appropriate. An interpretation that the regulation requires express disagreement is unsupported by the supplemental claim statutes and seems a vestige of the legacy system.

[200] *Ante* at 21.

[201] *Id*.

[202] 38 U.S.C. § 7104(d)(1).

[203] R. at 5.

29

The problem is that the Board seems to have been unaware that, 10 months earlier, the Court of Appeals for the Federal Circuit had decided *Military-Veterans Advocacy v. Secretary of Veterans Affairs* (*MVA*), invalidating § 14.636(c)(1)(i) because its "differential treatment of § 5104C(b) supplemental claims[—those filed more than one year after the AOJ's initial decision—]clearly contravenes § 5904(c)(1)'s requirement that paid representation be available for all forms of administrative review under the AMA."[204] The Board's reliance on the invalidated regulation was more than a lack of polish; the Board gave supplemental claims filed more than 1 year after the AOJ decision the same forbidden treatment, excluding such claims from those it "considered part of the earlier claim" for purposes of attorney fees.[205] The Board's blunder is pivotal here because the later (September 2021) claim was filed 14 years after the initial one and was thus boxed out by the Board even if the later claim satisfied the statutory definition of "supplemental claim" in 38 U.S.C. § 101(36) and section 5108. Rather than vacating the Board's decision and remanding the matter for the Board to apply *MVA* and the statutes, the majority took over—and works hard, with ten tools and an imaginary watchdog, to justify the Board decision.

Before turning to the powerful precedent that should push us the other way, there is more support, both statutory and regulatory, for the veteran's supplemental claim status. The AMA "extensively overhaul[ed] the administrative appeals process concerning VA benefits decisions,"[206] creating a whole new world with different paths for pursuing benefits.[207] A prominent feature of the new system is the supplemental claim, which facilitates that pursuit and the preservation of the earliest effective date when the claim is successful.[208] A veteran may continuously pursue a claim or an issue by timely and properly filing a supplemental claim after any decision by the AOJ, the Board, or this Court.[209] The Board reports that, "[s]ince AMA implementation through the end of FY 2023, the Board has received approximately 279,414 (16%) appeals, compared to 1,522,281 (84%) [higher level review] or supplemental claims at VBA."[210]

---

[204] *MVA*, 7 F.4th 1110, 1139–40 (Fed. Cir. 2021).

[205] R. at 5.

[206] *Mattox v. McDonough*, 34 Vet.App. 61, 63 (2021), *aff'd*, 56 F.4th 1369 (Fed. Cir. 2023).

[207] *Brack v. McDonough*, ___ Vet.App. ___, ___, No. 22-3957, 2024 WL 1756076, at *5-6 (Apr. 24, 2024).

[208] *Aviles-Rivera v. McDonough*, 35 Vet.App. 268, 280 (2022).

[209] 38 C.F.R. § 3.2500(c) (2023).

[210] 2023 BD. OF VETERANS' APPEALS, U.S. DEP'T OF VETERANS AFFS. ANN. REP. 24,

The supplemental claim is the AMA's flexible sealant—available to fix any leak or other problem.[211] In addition to section 101(36) and section 5104C, the AMA changed notice requirements, with section 5103 now requiring regulations that "specify different contents for notice based on whether the claim concerned is an original claim or a supplemental claim,"[212] rather than "based on whether the claim concerned is an original claim, a claim for reopening a prior decision on a claim, or a claim for an increase in benefits."[213] The AMA changed the effective date statute to address awards based on "an initial claim, or a supplemental claim, of compensation, dependency and indemnity compensation, or pension,"[214] rather than on "an original claim, a claim reopened after final adjudication, or a claim for increase, of compensation, dependency and indemnity compensation, or pension."[215] And the AMA changed the statute addressing the commencement of payments so "the term 'award or increased award' means—(1) an original award or award based on a supplemental claim; or (2) an award that is increased because of an added dependent, increase in disability or disability rating, or reduction in income,"[216] rather than "(1) an original or reopened award; or (2) an award that is increased because of an added dependent, increase in disability or disability rating, or reduction in income,"[217] The changes to section 5103 and section 5110 show that Congress substituted supplemental claims for reopened claims and claims for increased compensation[218]; section 5111 substitutes supplemental claims for reopened awards but still contemplates increased ratings, showing only that it is possible to have an increased rating from other than a supplemental claim.

---

https://www.bva.va.gov/docs/Chairmans_Annual_Rpts/ bva2023ar.pdf.

[211] *See, e.g., Cook v. McDonough*, 36 Vet.App. 175, 186 (2023) (noting that the Board "instructed Mr. Cook to file a supplemental claim if he wanted this evidence [received outside the designated window] considered"); *Aviles-Rivera*, 35 Vet.App. at 274 (noting the Secretary's argument "that the veteran is not prejudiced by the adverse Board decision as he is free to file a supplemental claim that will allow consideration of new and relevant evidence"); *Cowan v. McDonough*, 35 Vet.App. 232, 249 (2022) (declining to discuss "whether Mr. Cowan would be prejudiced by any notice error if he may still file a supplemental claim and preserve his effective date").

[212] 38 U.S.C. § 5103(a)(2)(B)(i) (Supp. IV 2023).

[213] 38 U.S.C. § 5103(B)(i) (Supp. III 2016).

[214] 38 U.S.C. § 5110(a)(1) (Supp. IV 2023).

[215] 38 U.S.C. § 5110(a)(1) (Supp. III 2016).

[216] 38 U.S.C. § 5111(d) (Supp. IV 2023).

[217] 38 U.S.C. § 5111(d) (Supp. III 2016).

[218] "Under the AMA, [supplemental] claims have replaced claims to reopen from the legacy system." *MVA*, 7 F.4th at 1133.

*MVA Should Rule the Day*

The plain meaning of the statutes and regulations defining and empowering supplemental claims plus the Federal Circuit's thoughtful attention to supplemental claims in *MVA* should make the answer to Attorney Jackson's fee application a simple "yes."[219]

In *MVA*, the Federal Circuit invalidated 38 C.F.R. § 14.636(c)(1)(i) for its limitations on when a veteran's representative may charge fees for work on supplemental claims.[220] Specifically, the regulation "permit[ted] claimants to receive paid representation for all work on a § 5104C(a) supplemental claim—including the preparation and filing of such a claim—but require[d] a § 5104C(b) supplemental claim to be first denied before paid representation is available."[221] The Federal Circuit concluded that this "differential treatment of § 5104C(b) supplemental claims clearly contravenes § 5904(c)(1)'s requirement that paid representation be available for all forms of administrative review under the AMA."[222] With § 14.636(c)(1)(i) invalidated, the statute and regulation permit claimants to receive paid representation for all work on supplemental claims, including the preparation and filing of such claims.[223] The Federal Circuit held that section "5904(c)(1) plainly permits paid representation for all forms of administrative review after the AOJ's initial decision on the original claim for benefits."[224] In this case, the AOJ's "initial decision on the original claim for benefits" was in March 2008.

What's more, *MVA* said the Federal Circuit had expressly rejected VA's longstanding interpretation of legacy reopening claims—and any other post-final claims based on new evidence—"as belonging to a 'case' separate from that of the original claim for benefits."[225][226] And, for good measure, the Federal Circuit repeated:

---

[219] *See Helmick v. McDonough*, 34 Vet.App. 141, 147 (2021) ("The process for determining the meaning of statutes and regulations is well established. . . . We look to the plain meaning of statutes and regulations and, when we find plain meaning, our job is simply to apply it.").

[220] 7 F.4th at 1137.

[221] *Id*.

[222] *Id.* at 1139–40.

[223] *Id*. at 1137.

[224] *Id*. at 1140.

[225] *Id*. at 1139 (quoting the Secretary's brief).

[226] By statute, "a legal fee may not be charged, allowed, or paid for services of agents and attorneys with respect to services provided before the date on which a claimant is provided notice of the [AOJ's] initial decision *with*

[W]e reject the government's proposition that this court has previously endorsed the VA's longstanding interpretation of the fee provision—that is, "the basic principle that a reopening proceeding is separate from the original case" and thus foreclosed from paid representation until the VA issues a decision on the reopening claim itself.[227]

*MVA* also rejected "the government's implicit ratification argument," [228] —what the majority in this case calls the "dog didn't bark" canon.[229] The Federal Circuit emphasized that

[f]ar from "inaction" that would suggest implicit ratification of preexisting practices, the AMA dramatically overhauled the VA appeals process by replacing the "broken," one-size-fits-all legacy system with a new three-lane system. Given the extent and nature of the AMA's reforms, we think it unlikely that Congress intended to preserve the VA's "longstanding interpretation" of the fee statutory provision from the superseded legacy system, especially where the regulation at issue contradicts both the plain and ordinary meaning of the statutory provision and the statutory history.[230]

And the Federal Circuit related supplemental claims to CUE claims—thereby connecting *MVA* to *Held v. McDonough*,[231] *Carpenter v. Nicholson*,[232] and *Stanley v. Principi*,[233]—declaring:

Just as a CUE claim belongs to the same "case" as a veteran's original claim for benefits, thereby permitting paid representation for work performed after an AOJ's initial decision, so too does a § 5104C(b) supplemental claim seeking the "same or similar benefits on the same or similar basis" as the original claim.[234]

In a recent case, the Federal Circuit said that "[w]e have taken a broad view of the term," stating that "a 'case' within the meaning of Section 5904(c) encompasses 'all potential claims raised by the evidence, applying all relevant laws and regulations, regardless of whether the claim is specifically labeled.'" [235] In *Perciavalle*, the Federal Circuit concluded that post-traumatic stress

---

*respect to the case*." 38 U.S.C. § 5904(c)(1) (emphasis added).

[227] *Id*. at 1140 (again quoting the Secretary's brief).

[228] *Id*.

[229] *Ante* at 20 n.122.

[230] *Id*.

[231] 37 Vet.App. 28 (2023).

[232] 452 F.3d 1379 (Fed. Cir. 2006).

[233] 283 F.3d 1350 (Fed. Cir. 2002).

[234] *Id*. at 1141.

[235] *Perciavalle v. McDonough*, 101 F.4th 829, 836 (Fed. Cir. 2024) (quoting *Jackson* (*Francis*) *v. Shinseki*, 587 F.3d 1106, 1109 (Fed. Cir. 2009)).

disorder and unemployability claims with separate Notices of Disagreement were, even though in separate claim streams, part of the same case.[236] *Perciavalle* cited *Cameron v. Shinseki*,[237] but only to point out the case I had erroneously relied upon. *MVA* ignored *Cameron* but explained that its premise—that new evidence after a final decision brought a new case—was misplaced.[238] In *Held*, the Court differentiated between the initial decision with respect to the underlying case that triggers entitlement to attorney fees and the initial decision under 38 C.F.R. § 19.2 that triggers the application of the AMA.[239]

It is ironic that the majority's proclaimed holistic approach to the law leads it to embrace VA's fragmented microcase approach. The majority does yeoman's work to get there. But it all depends on jettisoning the definition of supplemental claim Congress added at section 101(36), or at least rewriting it. And "'[i]t is not for us to rewrite the statute so that it covers only what we think is necessary to achieve what we think Congress really intended.'"[240]

Under the AMA, Congress changed the triggering event for attorney fees to permit paid representation after a veteran receives notice of the AOJ's initial decision so a veteran will be able to hire an attorney to provide advice and assistance in making an informed choice among the expanded options for seeking review of a decision on a claim.[241] As this case illustrates, the system is not self-actuating. There are inflexible rules that may be counterintuitive, complicating concerns to weigh, and choices to make that have consequences, including who will be making the decision, whether there will be a hearing, whether evidence can be submitted and, if so, when, and how long it will take to get a decision. Enabling veterans to have the advice, assistance, and advocacy of an attorney to sharpen the identification and presentation of the relevant facts and applicable law increases the likelihood of an appropriate outcome and may make the system faster and fairer. "In

---

[236] 101 F.4th at 838-39.

[237] 26 Vet.App. 109, 111 (2012).

[238] *MVA*, 7 F.4th at 1139.

[239] *Held*, 37 Vet.App. at 38.

[240] *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 678 (2020) (quoting *Lewis v. Chicago*, 560 U.S. 205, 215 (2010)).

[241] *MVA*, 7 F.4th at 1136.

the claimant-friendly world of veterans benefits, 'the importance of systemic fairness and the appearance of fairness carries great weight.'"[242] This is no time to regress. I respectfully dissent.

---

[242] *Arneson v. Shinseki*, 24 Vet.App. 379, 387 (2011) (quoting *Hodge v. West*, 155 F.3d 1356, 1363 (Fed. Cir. 1998)).